IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 1:22-cr-154-04 |
| | ) |
| RICARDO GLENN THORNE, JR. | ) |

POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING

Ricardo Thorne comes before the Court for sentencing after having pled guilty to using an instrumentality of interstate commerce to advertise an animal for use in an animal fighting venture, in violation of 7 U.S.C. § 2156 and 18 U.S.C. § 49. The government has reviewed the Presentence Investigation Report (the "PSR"), which calculates the total offense level to be 14 and the defendant's criminal history category to be I, resulting in a Guidelines range of 15–21 months. In light of Thorne's extraordinarily extensive involvement in dogfighting over two decades (and related factors, discussed below), the Court should impose a sentence of at least 24 months of incarceration – and a significant fine.

"The DMV Board" and Pertinent Facts[1]

The prosecution of Thorne arose from an investigation into co-conspirator Rodriguez Norman for credit card fraud and related offenses. During the course of that investigation, law enforcement obtained warrants to intercept wire communications between Norman and his conspirators and learned that Norman was also involved in dogfighting. In addition to talking on

---

[1] A thorough background regarding dog fighting and the legal framework applicable to dogfighting prosecutions can be found in the government's sentencing memorandum for co-defendant Charles Williams. *See United States v. Williams*, 1:22-cr-154-06 (E.D. Va.), ECF 108. The government incorporates by reference that section of the memorandum into the instant pleading.

the phone to Thorne and other dogfighters, Norman communicated with them on Telegram, an encrypted instant messaging service, through a group named "The DMV Board". Through those communications, the members of the DMV Board coordinated dog fights in the Washington, D.C. metropolitan area (and elsewhere along the East Coast).

Thorne, along with dozens of other individuals - - including his six co-defendants - - was a member of the DMV Board; he went by the nickname "Rip" and used the kennel name "Darkside." Board members were in constant communication about all aspects of dogfighting, including training techniques to maximize the chances of developing champion fighting dogs; setting up dog fights in which they entered dogs; recounting dog fights; finding dogfighting matches for their dogs; offering and accepting bets on dog fights; sharing news regarding dog fighters who had been arrested; and discussing methods to evade detection by law enforcement.

Thorne regularly discussed with his conspirators the breeding of fighting dogs. For example, in October 2015, Thorne told conspirator Anthony "Monte" Gaines that Thorne purchased the dog "Hit Man" from (co-defendant) Laron West for breeding. Docket Entry ("DE") 84 at ¶ 1 (Statement of Facts). Thorne also told Gaines that Thorne had a female fighting dog who had killed two other dogs, and was in demand for breeding. *Id*. at ¶ 3. In April 2016, Thorne modified an on-line pedigree profile for his fighting dog Darkside Macho Redzz. *Id*. at ¶ 3. In June 2016, Thorne sought to obtain from (co-defendant) Charles Williams puppies sired by a fighting dog of Williams known as "Fish Grease." *Id*. at ¶ 7. In August 2017, Thorne told Norman that Thorne was going to breed his fighting dogs to Darkside Macho Redzz. *Id*. at ¶¶ 14, 15.

Thorne not only bred fighting dogs, he actively sought to enter them in fights. For example, in June 2017, Thorne posted to the DMV Board a solicitation to arrange a fight for a 35-pound male dog. *Id.* at ¶ 9. In July 2017, Thorne told Norman that Thorne was trying to arrange a fight for a 40-pound female dog. *Id*. at ¶ 13. In October 2018, Thorne posted on the DMV Board offers

to arrange fights for his 36-pound male dog and his 40-pound male dog. *Id*. at ¶ 16. Later that same month, Thorne told (co-defendant) Shaborn "Shy" Nesbitt that Thorne had successfully arranged a fight for his 40-pound male dog, for a stake of $5,000. *Id*. at ¶¶ 17, 18.

Thorne was deeply involved with fighting dogs for decades. In June 2017, Thorne posted to the DMV Board that he had won $15,000 at a single dog fighting show. *Id*. at ¶ 8. In January 2019, he told the DMV Board that he had been fighting dogs for over 20 years. *Id*. at ¶ 19. That statement is consistent with other of his statements over the years. For example, in 2015, Thorne told Gaines that "every dog we lost to went on to make champion." *Id.* at 1. Thorne told Gaines that Thorne sold West two fighting dogs, including one who lost "game" and "scratched dead" after a fight that lasted one hour and 37 minutes. Thorne told Gaines that Thorne had a dog that killed six other dogs in less than a year. Thorne told Gaines that Thorne had another dog that won three fights at 18 months old, but that, on another occasion, he drove for hours to North Carolina for his dog to lose in only 15 minutes. *Id*. at ¶ 5. In June 2017, Thorne posted to the DMV Board that he had a fighting dog that "never crank up til three years old when he did start killed everything he touched and won three in the box." *Id*. at ¶ 11.

Thorne's statement of involvement in dogfighting for 20 years also is corroborated by pedigrees that were posted online. Attached to this pleading as Exhibit 1 are copies of the pedigrees found online for "CH Darkside's Beta 4XW" and "Darkside's Assassin 3XOTC 1XD". The pedigree for "CH Darkside's Beta 4XW" was first posted in 2001, and the pedigree for "Darkside's Assassin 3XOTC 1XD" was first posted in 2005; each has been viewed over 16,000 times. According to the pedigree, "CH Darkside's Beta 4XW" was the sire for "Darkside's Assassin 3XOTC 1XD" – and they are asserted to have gained "champion" status by winning eight fights between them.

Thorne was more than merely a dog fighter; in fact, he staged dog fights for money.  Thorne told Gaines that Thorne had organized dog fights for years – and that those fights were attended by "50 to 70 people."  He bragged that he had made a lot of money from charging admission to dog fights that he held at a warehouse, and did it for years, and that he never "got popped."  Thorne said:

> Now, we did some reckless stuff back in the day. We used to -- right there, you could ask Frog, all the old timers. We used to use a warehouse right on Kenilworth Avenue, right next to the PepsiCola plant. But it was a warehouse, and my man ran the warehouse. So, we would set up shop the night before. We would have shows sometimes from nine at night to five in the morning. The warehouse was so big, people would be in the rafters.
>
> But the thing about it was, the warehouse was right off a main road. You could actually park your car in there, if you was the -- the people that was doing the dogs, if you wanted to, you know what I'm saying, or be around the corner, whatever you wanted to do. But it was a -- what you call it? It was like an industrial district, like a warehouse district, you know what I'm saying? . . .
>
> So, we did that for years, and we -- I ain't gonna lie, we made a lot of money off the gate, to pay for the show . . . . . But anyway, we did that for a while, for a good little while, and I never really realized how many people was there until one day, I sat back and thought about it, man. They was shows, but they was over 50 to 70 people there, and we never got any trouble, because we handled it business-like.

*Id*. at ¶ 4.  In that same conversation, Thorne continued, "we did that for years, and never got caught. It was only -- it was only even God's blessing that we didn't get popped, or it was just a matter of time."[2]

On July 30, 2019, investigators executed a search warrant at Thorne's residence in Camp Springs, Maryland.  In the course of the search, they found dogfighting instruments including breeding stands, flirt poles, pedigree information, scales and weighted collars, and nine pit bull-

---

[2] A portion of the transcript of the call between Thorne and Gaines is marked as GX 215T, and attached as Exhibit 2 to this pleading.

type dogs, many with scarring patterns and lacerations consistent with animal fighting. *Id.* at ¶¶ 20, 21. Here are photos of four of them:

   

On July 30, 2019, when investigators questioned Thorne, he claimed that he did not know that there were nine dogs tied up in the yard of his residence, and that only one of them was his. He told investigators that he had never been involved in dogfighting, and that he knew nothing about the DMV Board. *Id.* at ¶¶ 22, 23.

Thorne well knew that his dogfighting activities were illegal, and that law enforcement authorities were pursuing his fellow dogfighters. In 2015, Thorne told Gaines that he did not drive his own car or bring his work ID with him to a dog fight, because that was how other dog fighters had been caught. *Id.* at ¶ 5.[3] In 2017, Thorne posted to the DMV Board that "this shit was never legal." *Id.* at ¶ 10.

Sentencing Guidelines

While Thorne pled guilty to a substantive violation of 7 U.S.C. § 2156 and 18 U.S.C. § 49, DE 83 ¶ 1 (Plea Agreement), he admitted in his Statement of Facts that he engaged in a dog fighting conspiracy. DE 84 ¶ 1. The PSR correctly calculated Thorne's Base Offense Level as 16. Because the defendant has accepted responsibility within the meaning of U.S.S.G. § 3E1.1(a), he

---

[3] In fact, Laron West's identification was found by law enforcement in the car that he and Charles Edward Williams, III, used to drive to the dog fight in Philadelphia in March 2018, at which Williams was arrested.

is entitled to a two-level reduction. The Total Offense Level is thus 14. Because Thorne's known criminal history results in a Criminal History Category I, the PSR calculates his Guidelines range to be 15–21 months. For the reasons described below, his actual sentence should be above that range.

### A. Victims Should Be Considered, Even if Insufficient for an Enhancement

As the Probation Officer wrote:

> While the animals involved in this offense were subjected to significant brutality, and many killed, as a result of the co-conspirators' actions, they do not qualify as victims for federal criminal restitution purposes.

PSR ¶ 73. Because the victimization of fighting dogs is inherent in the offense of conviction itself, we do not ask for an enhancement for victims in this case. Nevertheless, we cannot help but point out that the dogs set to fight each other are victims, forced to live lives that are nasty, brutish, and (for virtually all) short. Their number is impossible to list, but surely includes Thorne's fighting dogs – as well as all the dogs (named and unnamed) that were put in a ring to fight with Thorne's dogs. We *know* that ones directly attributable to Thorne include at least:

1. "CH Darkside's Beta 4XW" and "Darkside's Assassin 3XOTC 1XD" – who, between them, won at least eight fights;

2. The two fighting dogs that Thorne sold West, "including one who lost 'game' and 'scratched dead'" after a fight that lasted 1 hour and 37 minutes (PSR ¶¶ 33, 50);

3. The dog that killed six other dogs in less than a year (PSR ¶ 52) - - which might be "Darkside's Beta" or "Darkside's Assassin";

4. The dog that "never crank up til three years old when he did start killed everything he touched and won three in the box" (PSR ¶ 58) - - which might be Darkside's Beta or Darkside's Assassin;

5. "Hit Man" (PSR ¶ 48);

6. "Darkside Macho Redzz" (PSR ¶ 53);

7. The female fighting dog in heat who had killed two other dogs (PSR ¶¶ 34, 50);

8. The dogs at the shows put on by Thorne off Kenilworth Avenue, attended by 50-70 people (PSR ¶ 51);

9. The dog that won three fights at 18 months old, after Thorne "rolled" her as a puppy with a guy in Waldorf, but that, on another occasion, he drove for hours to North Carolina for his dog to lose in only 15 minutes (PSR ¶ 52);

10. The 36-pound male dog and his 40-pound male dog for which Thorne sought fights through the DMV Board on 10/24/18 (PSR ¶¶ 63, 64);

11. The 40-pound male dog for which Thorne arranged a fight for $5,000 (PSR ¶¶ 63, 64, 65); and

12. The nine scarred dogs found at Thorne's residence in 2020 (PSR ¶¶ 42, 68, 69) – which *might be* some of the dogs listed above (although not likely dogs born as long ago as "Darkside Beta" and "Darkside Assassin").

In short, we do not know how many dogs that Thorne set to fighting over the last 20 years, but we do know that there were a *lot* of them. Regardless of a guideline enhancement for victims (or for the number of dogs involved in his criminal activity)[4], his sentence should account for the sheer magnitude of Thorne's dogfighting activities over the years.

> B. Obstruction Should be Considered, Even if Insufficient for an Enhancement

The uncertainty regarding the identity of the dogs seized at Thorne's residence in 2020 is compounded by Thorne's false statements to investigators at the time. Thorne told investigators that he did not know that there were nine dogs tied up in the yard of his residence, and that only one of them was his. Thorne said that he had never been involved in dog fighting, and that he knew nothing about the DMV Board. DE 84 at ¶¶ 22-23. As the Probation Officer noted, these false statements prevented the investigators from ascertaining the owners of at least seven of the nine fighting dogs found at Thorne's residence on July 30, 2019. PSR ¶ 75.

---

[4] Pursuant to the application note to U.S.S.G. § 2E3.1, an upward departure may be warranted if the offense involved animal fighting on an exceptional scale (such as an offense involving an unusually large number of animals).

7

We understand that a Guidelines enhancement for obstruction of justice under U.S.S.G. § 3C1.1 turns on whether the defendant's conduct *significantly* obstructed the investigation. We do not here seek to litigate the applicability of the obstruction enhancement. Nevertheless, Thorne's false statements to law enforcement most certainly affected investigators' efforts to identify the owners of the dogs found at Thorne's residence, as well as other members of the DMV Board, and other dogfighters generally.

In the course of the investigation, investigators seized (and rescued) dozens of dogs from dogfighters, such as co-conspirators Norman, Harvey, and Wilson - - but they never found the dogs that belonged to Hilliard or Williams. Thorne's false statements obstructed the attempts of the investigators to find those dogs – or, if they were among the dogs at Thorne's house, *stop* searching for them. Likewise, investigators were aware that there were over 20 members of "The DMV Board," but only seven of them were indicted in Thorne's case. Thorne's denial of his involvement in the DMV Board obstructed the efforts of investigators to identify and eventually prosecute the rest of the members - - including those who - - according to *Thorne*, kept fighting dogs in his back yard.

Had Thorne answered investigators' basic questions truthfully, they could have asked him follow-up questions (such as, "what are the names of the dogs in your back yard, and if you are not their owner, *who* is?", "Where is Darkside Macho Redzz?", and "Who are these members of the DMV Board?"). Thorne's responses to questions such as these could have led to the rescue of dogfighting dogs and the identification of other dogfighters. Regardless of a guideline enhancement for obstruction, his sentence should account for the Thorne's false statements to law enforcement when the dogs were seized from his property in 2019.

8

### C. <u>Acceptance of Responsibility – But No Expression of Remorse</u>

Thorne was more forthcoming with the probation officer than he had been with the law enforcement agents in 2019, but just barely. Indeed, he declined to speak to her about dogfighting at all. Although he wrote the probation officer that "I just want to express my remorse for placing that ad", the words "dog fighting" are not mentioned. PSR ¶ 76.

While we agree with the award of reduction for acceptance of responsibility, Thorne's sentence still should account for his failure to manifest any recognition of the depravity of his criminal conduct over the last 20 years.

### D. <u>Criminal History Category I – but a Prior Gun Conviction</u>

Further, although Thorne is a Criminal History Category 1, that may be attributable to his inconsistency in using the suffix "Jr." next to his name. When he entered his guilty plea, Thorne specifically told this Court that he was a "Jr." Enclosed as Exhibit 3 are redacted copies of Thorne's DMV records and a "lost passport notice" he filed; in neither of which did he claim to be a "Jr." This inconsistency is significant in light of Thorne's admission to Gaines that confusion regarding whether he was (or was not) a "Jr." caused a criminal conviction that properly was in his name to be mistakenly expunged.

During an intercepted call between Thorne and Gaines (and, as noted in Footnote 7 on page 17 of the PSR), Thorne claimed to have had a previous "gun charge" expunged from his criminal record due to a clerical error in the arrest record that listed his birth year as 1954, rather than 1970. During the call, Thorne indicated the error likely occurred because his father had a criminal record and was "in the system" at the time Thorne himself was arrested. Thorne admitted to Gaines in the call that "All the time, it was me." We do not dispute that Thorne is a Criminal History Category I, but the Court should consider in imposing its sentence that

Thorne's valid gun conviction was expunged as a result of confusion that likely was fueled by his inconsistent use of the suffix "Jr." in his name.

        E.    Thorne Should Pay a Fine

The PSR states that, in consideration of the defendant's financial condition, "it does not appear he would be capable of paying a punitive fine or the costs of incarceration or supervision", PSR ¶ 139, but that conclusion is clearly incorrect. A defendant who earned over $160,000 in 2020, and over $187,000 in 2021 should be able to pay a fine. PSR ¶ 123. This is true even more so for a defendant who is married to (and shares his home with) an emergency room tech. PSR ¶ 104. The calculation of Thorne's monthly cash flow does not consider the contribution to household expenses made by Thorne's wife, an emergency room technician. PSR ¶¶ 104, 136.[5]

### 3553a Factors

As described in detail above and in the government's sentencing memorandum for co-defendant Williams (incorporated here by reference), dogfighting is a cruel enterprise. A dog fighting venture requires substantial dedication over time, and Thorne, as well as his co-conspirators, devoted time and effort toward engaging in this criminal activity. Indeed, Thorne was deeply involved in dogfighting for years. He not only bred, bought, sold, and fought dogs, but he also organized dog fights to which scores of people paid admission to attend. Thorne admitted to

---

[5] Further, the PSR's listing of Thorne's assets appear to dramatically understate them. While the tax assessment of his residence is only $275,000, Zillow values it at $377,200. *See, e.g.,* https://www.zillow.com/how-much-is-my-home-worth/. While Zillow values are not always correct, they generally are a good estimate. Moreover, Thorne's monthly mortgage payment ($3,254 – PSR ¶ 136) is not consistent with a standard mortgage loan of $303,786 (much less a house valued at $275,000). We do not know the terms of Thorne's loan(s), but a monthly payment of $3,254 would support a 30-year loan of $370,000 at an interest rate of *ten* percent annually. *See, e.g.,* https://www.bankrate.com/mortgages/ mortgage-calculator/. The figures don't match for a 15-year loan, either; a monthly payment of $3,250 would amortize a 15-year loan in the amount of $350,000 at 6%. *Id.* In sum, it appears that the value of Thorne's residence is significantly understated, or the amount of his mortgage payments are significantly overstated.

involvement in the dogfighting conspiracy that lasted more than five years, and the evidence indicates that his involvement with dogfighting actually lasted far longer than that.

In light of the extensive, secretive networks that are needed to solicit opponents and to locate, buy and sell dogs of particular coveted bloodlines, dog fighting is organized crime in the traditional sense of that term. Accordingly, a dog fighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it. Further, dog fighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate.

Given the limited law enforcement resources available for cases such as this, and the strain it places upon animal shelters called upon to care for the large numbers of dogs seized in these investigations, it is imperative that the sentences imposed in the cases that are brought send a strong message of deterrence. Those who choose to brutalize animals for entertainment and profit must know that their criminal conduct will be severely punished. Consequently, a strong sentence is needed to "afford adequate deterrence to criminal conduct," both to Thorne and to other potential offenders. 18 U.S.C. § 3553(a)(2)(B).

This Court sentenced co-defendant Williams to 24 months in prison. Thorne's friend Gaines was sentenced (in the District of New Jersey) to 42 months in prison. PSR ¶ 16.[6] Co-defendants Hilliard and Garcia engaged in reprehensible conduct, but the conduct of Thorne (and Williams) was worse and far more extensive. Indeed, in some respects, Thorne's involvement in dogfighting was more extensive than that of Williams. After all, Thorne made

---

[6] Other multi-defendant federal dog fighting cases in this District as well as outside of this District also provide guidance as to the appropriate sentence. Those cases are outlined in the government's sentencing memorandum regarding co-defendant Williams and are incorporated by reference herein. *See United States v. Williams*, 1:22-cr-154-06 (E.D. Va.), ECF 108 at 16–18.

money by staging numerous dogfights over a period of years, but we have no evidence of similar involvement by Williams.[7]

## Conclusion

Dog fighting is a brutal criminal enterprise that profits from the suffering of helpless animals. Fighting dogs are subjected to cruel and inhumane conditions and are forced to live lives that are nasty, brutish, and (for virtually all) short. Justice requires that Thorne, who was involved in this horrible conduct for perhaps 20 years, be punished for his actions, and his sentence should stand as a warning to others who are considering getting involved in dogfighting that their crimes will not go unpunished. Because of Thorne's extraordinarily extensive involvement in dogfighting over a period of decades, the Court should impose a sentence of at least 24 months of incarceration, and a significant fine.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      /s/
Gordon D. Kromberg
Cristina C. Stam
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
gordon.kromberg@usdoj.gov
cristina.stam@usdoj.gov

---

[7] On the other hand, we have hard evidence of specific dog fights involving Williams; in contrast, for Thorne, we have only his admissions regarding past fights, and his solicitations for more recent fights on the DMV Board

CERTIFICATE OF SERVICE

I certify that on February 28, 2023, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/
Gordon D. Kromberg
Assistant United States Attorney